[No. B106165. Second Dist., Div. Five. July 14, 1997.]

PETER J. ROSEN et al., Plaintiffs and Appellants, v.
NATIONS TITLE INSURANCE COMPANY, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

\*This opinion is hereby certified for partial publication with the exception of part 2 of the Discussion. (See Cal. Rules of Court, rules 976(b) and 976.1.)

1490

**COUNSEL**

Polston, Schwartz, Hamilton & Fenster, Stephen M. Fenster and Howard J. Ettinger for Plaintiffs and Appellants.

Mark E. Schiffman and Lois S. Carver for Defendant and Respondent.

## OPINION

**GODOY PEREZ, J.**—Plaintiffs, a group of real estate lender-investors, appeal from the summary judgment granted on behalf of defendant Nations Title Insurance Company. For the reasons set forth below, we affirm that judgment.

### FACTS AND PROCEDURAL HISTORY

Barrich Company, Inc. (Barrich) was a real estate developer building two homes in the Laurel Canyon area of Los Angeles. Brentwood Bank of California (the bank) was the project's construction lender and the bank's loans were secured by first trust deeds on both properties. Barrich eventually defaulted on the construction loans and the bank began foreclosure proceedings. In early 1992, Barrich filed a chapter 11 bankruptcy petition in the federal bankruptcy court, which stayed the foreclosure pursuant to 11 United States Code section 362.

In June 1992, Barrich filed a bankruptcy court motion for permission to incur more debt—a so-called "priming lien loan"—in order to finish its construction project and thus generate more revenue for itself and its creditors. Such priming loans gain court-ordered priority over any existing encumbrances and are authorized by 11 United States Code section 364(d). The motion was granted in July 1992 over the bank's strong opposition. The bankruptcy court's order authorized Barrich to obtain two loans of $165,000 each, both of which would be secured by trust deeds taking priority over the bank's existing trust deeds. The court ordered that the loan funds be used only to complete the construction project or to pay expenses essential to preserve the assets of Barrich's bankruptcy estate. No other restrictions on the use or disbursement of the loan proceeds were ordered.

American Mutual Mortgage, Inc. (AMM), is in the business of making and arranging loans secured by real property. AMM arranged for a group of investors to fund two loans of $165,000 each on the two properties which Barrich sought to develop. Those investors are the plaintiffs and appellants: Peter J. Rosen, M.D., trustee of the Peter J. Rosen, M.D., Inc., a Medical Corporation Profit Sharing Plan; Bear, Stearns & Company, Inc., custodian for the William Lamond IRA Rollover Account; Jerry and Susan Grosslight, trustees of the Jerry and Susan Grosslight Living Trust; Dennis and Ida Block; Milton P. Kaplan, M.D., trustee of the Milton P. Kaplan, M.D., Inc., a Medical Corporation Pension Plan; Wade Yoshii, M.D.; Sanford Polse, M.D., trustee of the Sanford Polse M.D. Profit Sharing Plan; Thomas

Neuman, DPM, trustee of the Thomas Neuman, DPM, a Professional Corporation Pension Plan; and Helene K. Swartz, Trustee Retirement Trust for C-Kay Associates, Inc.[1]

Appellants' loan funds were placed in escrow. The trust deeds securing the loan funds were recorded at 3:01 p.m. on September 4, 1992, and the loan funds were disbursed later. After appellants' trust deeds were recorded, TRW Title Insurance Co. (TRW) issued two title insurance policies in favor of appellants in connection with their trust deeds. The policies by their terms were effective at the same time and date that appellants' trust deeds recorded.[2]

Nations was aware that the bank's preexisting trust deeds were subordinated to appellants' trust deeds due to the bankruptcy court's order granting Barrich's priming motion, and issued the policies knowing that the bank had challenged the priming loan motion and might do so again. The bank's subordinated trust deeds were noted in and not excluded from coverage by the title policies.

On August 24, 1993, the bank, having previously obtained permission from the bankruptcy court to do so, foreclosed on its trust deeds and took title to the construction project properties subject to appellants' priming loan trust deeds. In October 1993, Barrich defaulted on appellants' priming loans and appellants began foreclosure proceedings. In December 1993, the bank sued Barrich and appellants in federal district court in order to obtain a declaration that appellants' priming loan trust deeds should be subordinated to the bank's trust deeds. The gravamen of this action was twofold: (1) in violation of the bankruptcy court's order, Barrich had squandered appellants' loan funds on matters unrelated to the construction project; and (2) appellants negligently permitted this to happen by failing to monitor Barrich's use of those funds.[3]

Appellants tendered the defense of the bank's action to Nations. Nations denied the tender on the grounds that the asserted defect in appellants' title was created by appellants and that the allegations in the bank's action did not relate to the validity of the priming lien order itself but instead arose

---

[1]These parties will be referred to collectively as "appellants."

[2]Defendant and respondent Nations Title Insurance Company (Nations) later became successor in interest to TRW and assumed TRW's obligations in connection with appellants' title insurance policies. From this point on, when we refer to Nations we also refer to TRW.

[3]The bank later voluntarily dismissed its federal court action against Barrich and appellants and brought the identical action in Los Angeles Superior Court. For our purposes, the distinctions between the two actions are irrelevant and we will refer to them collectively as "the bank's action."

from conduct which occurred after the policy was issued and which was therefore outside the scope of coverage. Appellants paid for their own defense and eventually prevailed in the bank's action when the trial court for that action found no evidence the loan funds had been misused by Barrich.

On October 20, 1995, appellants sued Nations for bad faith and breach of the title policy. Both parties later filed cross-motions for summary judgment. The trial court issued a tentative ruling on June 13, 1996, granting Nations' motion and denying appellants' as moot. The court based its ruling on the fact that title insurance only applies to defects in title as of the date escrow closes, that the title defect alleged in the bank's action arose from events occurring after escrow closed and the title policies issued, and that as a result, the bank's action fell outside the express scope of coverage as stated in the policies. The motion was granted that day and judgment was entered July 10, 1996. This appeal followed.

### STANDARD OF REVIEW

■ Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 549 [5 Cal.Rptr.2d 674].) The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. (*Sosinsky* v. *Grant* (1992) 6 Cal.App.4th 1548, 1556 [8 Cal.Rptr.2d 552].) All doubts as to whether any material, triable, issues of fact exist are to be resolved in favor of the party opposing summary judgment. (*Ibid.*)

While the appellate court must review a summary judgment motion by the same standards as the trial court, it must independently determine as a matter of law the construction and effect of the facts presented. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1510-1511, 1513-1515 [285 Cal.Rptr. 385].)

■ A defendant moving for summary judgment meets his burden of proof of showing that a cause of action has no merit if that party shows that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (o)(2).) Once the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or defense. In doing so, the plaintiff

cannot rely on the mere allegations or denial of his pleadings, "but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (*Ibid.*; see *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 590 [37 Cal.Rptr.2d 653].)

DISCUSSION

1. *Scope of Coverage*[4]

 Appellants contend that Nations breached its duty to defend them, thus giving rise to claims for breach of contract and tortious breach of the implied covenant of good faith and fair dealing (bad faith). It is axiomatic that if Nations had no duty to defend, there was no breach of contract. The bad faith claim is also dependent on the existence of a duty to defend. Absent such a contractual duty, the cause of action cannot stand. (*Golden Security Thrift & Loan Assn. v. First American Title Ins. Co.* (1997) 53 Cal.App.4th 250, 258 [61 Cal.Rptr.2d 442] (hereafter *Golden Security*).)

 An insurer must defend its insured if the insurer becomes aware of, or if a lawsuit against its insured pleads, facts which give rise to potential liability under the policy. The duty arises so long as the facts—either as expressed or implied in the complaint or as learned from other sources—give rise to a potentially covered claim. It is implicit in this rule that the duty to defend is broader than the duty to indemnify. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619] (hereafter *Waller*).)

The duty of defense is a continuing one, arising on the tender of defense and lasting until either the underlying lawsuit ends or until it has been shown that there is no potential for coverage. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (hereafter *Montrose*).) The insured's desire to secure a defense paid by the insurer is as important as the desire to obtain indemnity for possible liability. An immediate duty to defend is therefore necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf. (*Id.* at pp. 295-296.) As a result, our courts have been solicitous of an insured's expectations in this regard and have resolved all doubts in the insured's favor. (*Id.* at p. 296; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) The duty arises even if the

---

[4]Title insurance policies are governed and construed according to the law applicable to insurance policies in general (*Lambert v. Commonwealth Land Title Ins. Co.* (1991) 53 Cal.3d 1072, 1077 [282 Cal.Rptr. 445, 811 P.2d 737]), and we rely on those laws in reaching our decision.

claims asserted against the insured are baseless and even applies to noncovered claims so long as any one of the claims discloses the potential for liability covered by the policy. (*Devin* v. *United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1157 [8 Cal.Rptr.2d 263].)

Even so, the insurer's duty to defend is not absolute but is measured by the nature and kinds of risks covered by the policy. (*Waller, supra,* 11 Cal.4th at p. 19.) We may not impose coverage by adopting a strained or absurd interpretation in order to create an ambiguity where none exists. (*Waranch* v. *Gulf Insurance Co.* (1990) 218 Cal.App.3d 356, 359 [266 Cal.Rptr. 827].)

■ Insurance policies are written in two parts: an insuring agreement which defines the type of risks being covered, and exclusions, which remove coverage for certain risks which are initially within the insuring clause. Therefore, before considering whether any exclusions apply, a court must examine the coverage provisions to determine whether coverage exists at all. (*Collin* v. *American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 802-803 [26 Cal.Rptr.2d 391].)

This rule is significant for two reasons. First, when an occurrence is clearly not within the coverage clause, it does not also have to be specifically excluded. "Second, although exclusions are construed narrowly and must be proven by the insurer, the burden is on the insured to bring the claim within the basic scope of coverage, and (unlike exclusions) courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage. [Citations.]" (21 Cal.App.4th at p. 803.)

■ "To prevail, the insured must prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential. . . .*" (*Montrose, supra,* 6 Cal.4th at p. 300, original italics.) "[T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citations.] [¶] Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability. [Citations.]" (*Waller, supra,* 11 Cal.4th at p. 19.)

■ Finally, the interpretation of an insurance policy is a question of law and, as such, we will independently determine the proper construction. (*Bluehawk* v. *Continental Ins. Co.* (1996) 50 Cal.App.4th 1126, 1131 [58 Cal.Rptr.2d 147].)

The insuring clause of Nations' policies insured, "as of Date of Policy," against loss or damage due to any defect in or lien or encumbrance on the title, the invalidity or unenforceability of the lien of the insured mortgage upon the title, and the priority of any lien or encumbrance over the lien of the insured mortgage. Relying on the decisions in *National Mortgage Corp.* v. *American Title Ins. Co.* (1980) 299 N.C. 369 [261 S.E.2d 844] (hereafter *National Mortgage*) and *Mark Twain Kansas City Bank* v. *Lawyers Title Ins. Corp.* (E.D.Mo. 1992) 807 F.Supp. 85 (hereafter *Mark Twain*), the trial court ruled that the scope of coverage afforded by the term "date of policy" was limited to defects which existed when the policy became effective. Since the bank's action was based on conduct which occurred later—appellants' alleged negligence in monitoring Barrich's use of the priming loan funds—the court found that the bank's action fell outside the scope of coverage and that Nations therefore had no duty to defend that action.

Appellants contest the trial court's reasoning by attempting to distinguish *National Mortgage* and *Mark Twain* on the basis that Nations assumed the risk of the bank's legal challenge. As set forth below, we conclude that *National Mortgage* is both compatible with our decisional law and applicable on these facts.[5]

In *National Mortgage, supra,* 299 N.C. 369 [261 S.E.2d 844], the lessors of vacant commercial property agreed to subordinate their fee simple title to the lessee's construction loan. National Mortgage was the lessee's construction lender and obtained a first trust deed over the lessors' subordinated title to secure its loan. The loan funds were disbursed to the lessors six days after the subordination agreement and construction loan first trust deed were recorded, which was also six days after the title policy's effective date.

When the lessee/borrower defaulted, the construction lender began foreclosure proceedings. The lessors/owners sued to enjoin the foreclosure and obtain a declaration that their subordination agreement was invalid because the lessee breached that agreement by misusing the construction loan funds for purposes other than developing the property. The lessors obtained such a judgment, along with a declaration that the construction lender did not have a valid trust deed on the property.

The construction lender sued its title insurer, which had denied coverage on the ground that the acts which invalidated the lender's lien occurred after

---

[5]The decision in *Mark Twain* was based on certain exclusions to coverage, not on the scope of the insuring clauses. Even though Nations' policy contained the same exclusionary language, because we base our decision on the scope of the insuring clause, we need not reach the issues raised by *Mark Twain* and any purported ambiguities in the exclusionary terms of Nations' title policy. (*Golden Security, supra,* 53 Cal.App.4th at p. 255 [if the claim does not fall within the insuring clause, there is no need to analyze further].)

the effective date of the policy and were therefore outside the scope of coverage. The trial court found for the title insurer, and the North Carolina Supreme Court overturned the reversal of the trial court's ruling by the intermediate appellate court.

The *National Mortgage* court noted the general rule that title insurance is not prospectively applied, that policyholders are only protected against defects, liens or encumbrances in existence when they take title, and are not insured against defects which may arise later. (*National Mortgage, supra,* 299 N.C. at p. 375 [261 S.E.2d at pp. 847-848].) In line with this rule, the court held: "Due consideration of the record impels the conclusion that the [post-closing] disbursement and the subsequent misappropriation of the loan proceeds caused the nullification of the subordination agreement and the loss of plaintiff's lien on the [lessors'] property. There were no breaches of the subordination agreement as of [the policy's effective date]. Nor were there any fatal defects in the drafting or execution of the agreement on or prior to that date. Thus, the failure of the subordination agreement and the consequent loss of the lien cannot be attributed to matters in existence on the date the policy was issued. [T]herefore, . . . the loss incurred by the insured is not covered by the policy of title insurance sued upon in this case." (*Id.* at p. 376 [261 S.E.2d at p. 848].)

■ California law is the same. "Title insurance is a contract to indemnify against loss through defects in the title or against liens or encumbrances that may affect the title *at the time when the policy is issued.* [Citations.]" (*King* v. *Stanley* (1948) 32 Cal.2d 584, 590 [197 P.2d 321], italics added; *Walters* v. *Marler* (1978) 83 Cal.App.3d 1, 18 [147 Cal.Rptr. 655], disapproved on another point in *Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 507 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763].) " 'Generally, in other kinds of insurance, the policy protects the assured against matters that may arise during, and only during, a stated period after the issuance of the policy, but the risks of title insurance, although they may be referable to the contingency of future loss, are only designed to save the assured harmless from loss through defects, liens, and encumbrances that may affect or burden the title *at the time when the certificate or policy is issued. There is no implied agreement to go beyond the conditions existing at the time the policy is issued and to assume a general liability to indemnify against future encumbrances.* . . .' " (*Rice* v. *Taylor* (1934) 220 Cal. 629, 636 [32 P.2d 381], italics added, citation omitted.)

The preliminary title report which the title insurer provides before a policy issues is merely an inducement for the prospective insured to buy such insurance and for the insurer to state in advance the precise risk which it will

assume. (*Siegel* v. *Fidelity Nat. Title Ins. Co.* (1996) 46 Cal.App.4th 1181, 1192-1193 [54 Cal.Rptr.2d 84] (hereafter *Siegel*).) The insured may not rely on the title report alone to state a claim for negligence against the title insurer. (Ins. Code, §§ 12340.10, 12340.11.) The title insurer intends that the preliminary report represents only that a title insurance policy will be issued later which insures the title *"in the condition described in the preliminary report."* (*Siegel, supra,* 46 Cal.App.4th at p. 1192, italics added.) Since the preliminary report is issued before the policy, and since the title insurer only insures the title in the condition stated in the preliminary report, it seems clear that any changes in the condition of title after the policy is issued are outside the scope of coverage. This conclusion is made clear by the decision in *Safeco Title Ins. Co.* v. *Moskopoulos* (1981) 116 Cal.App.3d 658 [172 Cal.Rptr. 248, 18 A.L.R.4th 1301] (hereafter *Safeco*).

Moskopoulos had entered an oral agreement to buy certain real property from the Williamses, who were on the verge of losing the property in foreclosure. When the Williamses refused to put their agreement in writing and attempted to negotiate different terms, Moskopoulos sued for specific performance and filed a lis pendens on the property. They settled the action and the Williamses conveyed the property to Moskopoulos through an escrow which closed the same day as the foreclosure sale had been set to take place. Williams then dismissed his suit. Shortly after, the Williamses sued Moskopoulos for fraud, rescission and other related causes of action based on Moskopoulos's conduct leading up to the eventual transfer of the property. As part of that action, a lis pendens was filed on the property.

Moskopoulos had bought title insurance from Safeco which insured him *as of the date of the policy* against loss or damage due to any defect in or lien or encumbrance on his title or unmarketability of his title. The effective date of the policy coincided with the close of escrow. He tendered the defense of the action to Safeco, which assumed the defense with a reservation of rights. Safeco then sued Moskopoulos for declaratory relief, seeking a judicial determination that it did not owe Moskopoulos a duty of defense. The trial court found for Safeco.

On appeal, the judgment against Moskopoulos was affirmed, in part because the claims alleged in the complaint against him fell outside the insuring clauses of Safeco's title policy. First, the complaint alleged intentionally tortious conduct by Moskopoulos, not a defect in his title. "There is not a suggestion in the record or the briefs of any matter constituting a defect in or lien or encumbrance on the record title to the . . . property, except as disclosed in the policy. Nor is there any suggestion of any off-record risk in the chain of title coming within the policy coverage, such as a forged, altered

or improperly delivered deed, incompetency, incapacity, marital rights, or irregularities in any probate proceeding." (*Safeco, supra*, 116 Cal.App.3d at p. 666.) Second, the lis pendens filed against the property as part of the Williamses' suit did not render Moskopoulos's title unmarketable within the meaning of the title policy's insuring clauses since that lien was filed after the effective date of the policy. (*Ibid.*) "Neither [Moskopoulos's] conduct leading up to the [Williamses'] action nor the filing of [that] action [after the title policy took effect] can reasonably be construed as coming within the policy coverage." (*Ibid.*; accord, *Barczewski* v. *Commonwealth Land Title Ins. Co.* (1989) 210 Cal.App.3d 406, 413 [258 Cal.Rptr.386] [insured under a title policy was sued in an action seeking to rescind the priority of the insured's trust deed on certain real property based on allegations of contractual obligations of legal and equitable subordination and allegations that the earlier trust deed lacked consideration; applying *Moskopoulos* to those facts, the appellate court held that the title insurer owed no duty of defense since "tortious conduct involving behavior which does not constitute matters on the public record is not within coverage afforded in the standard policy of title insurance"].)

*National Mortgage* is therefore in accord with California law on the scope of coverage for title insurers and we adopt its reasoning. Such policies only insure against defects, liens or title challenges which exist when the policy took effect, not after. Combined with the decision in *Safeco, supra*, 116 Cal.App.3d 658, it is clear that the challenge to appellants' priming loan trust deeds which was raised in the bank's action was based on events occurring after Nations issued its title policy and that it therefore owed no duty to defend that action.

The complaint at issue in *Safeco* alleged intentionally tortious conduct by the insured which invalidated its title. The complaint at issue here alleged negligent conduct by appellants which supposedly invalidated the priority of their trust deeds. Such allegations do not constitute any title defect or lien or encumbrance on the property (*Safeco, supra*, 116 Cal.App.3d at p. 666) and to the extent appellants' predicate their claim on that portion of the insuring clause, *Safeco* demonstrates that the bank's action fell outside the scope of coverage.[6] Since the lis pendens in *Safeco* was filed after the title policy took effect, the insured's title was rendered unmarketable by events occurring outside the scope of coverage. The same is true of the bank's action, which was filed more than one year after the title policy took effect.

*National Mortgage*—which applied the same principles—is very nearly on point. The lender's trust deed was challenged based on the borrower's

[6]Further, the insured's tortious conduct in *Safeco* occurred *before* the title policy took effect, while the bank's action against appellants was based solely on allegations of negligent conduct after escrow closed and Nations' policy took effect.

misuse of loan funds which occurred after the title policy took effect. That was the basis of the bank's action: Appellants failed to monitor Barrich's use of their loan funds, which were disbursed and which Barrich allegedly misused after Nations' policy took effect.

Appellants attempt to distinguish *National Mortgage* as follows: Contrary to the subordination agreement and the expectations of the title insurer, the lender in *National Mortgage* disbursed the funds at once, rather than as construction progressed; while the subordination agreement in *National Mortgage* was breached, the trial court in the bank's action found no evidence that the loan funds had been misused and the bankruptcy court's priming loan order was therefore not breached; Nations knew the loan funds would be disbursed at once and they were; and because Nations knew all the circumstances surrounding the priming loans and the bank's previous challenges to those loans, the loss which occurred was contemplated by Nations as part of its coverage obligations.

We believe the trial court adequately addressed these distinctions in its tentative decision: "[Appellants'] attempts to distinguish *National Mortgage* . . . are unconvincing. The cases clearly hold that loan proceeds are not covered by the policy because the policies insure title only as of the date of the policy. It is not significant whether the insured lost control of his funds, the knowledge of the insured and insurer when the policy was issued or whether the funds were misappropriated or correctly disbursed. The critical fact is the time of the wrongful event in relation to the date of the policy."

Put another way, at the time Nations' policy took effect, there was nothing to indicate any defect in or competing liens or encumbrances on appellants' priming loan trust deeds and Nations cannot be deemed to have contemplated coverage for any later misuse of the loan funds. (*Safeco, supra*, 116 Cal.App.3d at pp. 665-666 [no reasonable construction of the title policy could impose on the insurer the obligation to defend any third party action seeking to rescind the property sale; no insured could reasonably have such an expectation].) Under *Waller, supra*, 11 Cal.4th at page 19, the determination of coverage is based upon an examination of the allegations of the complaint in the bank's action. That complaint did not allege any defects or liens at the time Nations' title policy took effect. Instead, as in *Safeco* and *National Mortgage*, it alleged misconduct or legal actions which occurred after and which therefore were outside the scope of coverage.[7]

---

[7]The *Safeco* court's judicial construction of the insuring clause and the term "date of policy" is part of Nations' policy and precludes any assertion that the term is ambiguous. (*Collin* v. *American Empire Ins. Co., supra*, 21 Cal.App.4th at p. 810.)

2. *Waiver of Coverage Issue\**

. . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondent Nations to recover its costs on appeal.

Turner, P. J., and Grignon, J., concurred.

---

\*See footnote, *ante*, page 1489.